**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------X
                                  :
**ANDRE GILMORE,**                :
                                  :
              **Plaintiff,**      :
                                  :
     -against-                    :     **REPORT AND RECOMMENDATION**
                                  :     **01 Civ. 2661 (CM)(MDF)**
**JO ANNE B. BARNHART,**          :
**Commissioner of Social Security,**  :
                                  :
              **Defendant.**      :
                                  :
----------------------------------X

**TO:  THE HONORABLE COLLEEN McMAHON, U.S.D.J.**

        Andre Gilmore brings this action pursuant to 42 U.S.C.
§ 405(g) seeking judicial review of the final decision of the
Commissioner of Social Security (the "Commissioner"), finding
that he was not entitled to disability insurance benefits under
the Social Security Act (the "Act").  Currently pending before
the Court are Plaintiff's and the Commissioner's cross-motions
for judgment on the pleadings, pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure.  For the reasons set forth
below, I respectfully recommend that your Honor grant the
Commissioner's motion, deny the Plaintiff's motion, and affirm
the decision of the ALJ.

## I.  BACKGROUND

        Plaintiff filed an application for disability insurance
benefits on August 7, 1998.  *See* Administrative Record ("AR") at

69-71.  The application was denied initially and on
reconsideration.  *See id*. at 47-56.  After a December 20, 1999
hearing, the Administrative Law Judge ("ALJ") denied Plaintiff's
claim.  *See id*. at 9-20.  The Appeals Council subsequently denied
Plaintiff's request for review of the ALJ's decision.  *See id*. at
4-5.  Plaintiff commenced the instant action in this Court in
March 2001.  By Stipulation and Order entered on August 28, 2001,
the matter was remanded to the Commissioner pursuant to sentence
six of 42 U.S.C. § 405(g)[1] for further administrative

---

[1]  Sentence six of § 405(g) states,

The court may, on motion of the Commissioner of Social
Security made for good cause shown before the
Commissioner files the Commissioner's answer, remand
the case to the Commissioner of Social Security for
further action by the Commissioner of Social Security,
and it may at any time order additional evidence to be
taken before the Commissioner of Social Security, but
only upon a showing that there is new evidence which
is material and that there is good cause for the
failure to incorporate such evidence into the record
in a prior proceeding; and the Commissioner of Social
Security shall, after the case is remanded, and after
hearing such additional evidence if so ordered, modify
or affirm the Commissioner's findings of fact or the
Commissioner's decision, or both, and shall file with
the court any such additional and modified findings of
fact and decision, and, in any case in which the
Commissioner has not made a decision fully favorable
to the individual, a transcript of the additional
record and testimony upon which the Commissioner's
action in modifying or affirming was based.

42 U.S.C. § 405(g).

proceedings.[2]  On remand, the Appeals Council vacated the decision of the ALJ and remanded the case for further proceedings.  *See* AR at 236-37.  The Appeals Council ordered the ALJ to: (1) obtain additional evidence concerning Plaintiff's orthopedic impairments, including, if available, updated reports from Plaintiff's treating sources, Dr. McMahon and Dr. Freeman, and, if warranted and available, a consultative orthopedic examination and medical source statements about what Plaintiff can still do despite the impairments; and (2) give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to the evidence in the record.  *See id*.  In December 2002, a second hearing was held before the ALJ at which the Plaintiff appeared with his attorney and testified.  *See id*. at 214-35.

A.    **Evidence Before the ALJ**

In his application for disability insurance benefits, Plaintiff provided a disability onset date of March 15, 1996. *See id*. at 69.  In the August 7, 1998 Disability Report, Plaintiff indicated that he suffered injury to his neck and back and that he suffers from "possible rheu[matoid] arthritis."  *Id*.

---

[2]  Because the remand was pursuant to sentence six of § 405(g), this Court retained jurisdiction over the matter pending further development of the record and consideration by the ALJ.  *See Raitport v. Callahan*, 183 F.3d 101, 104 (2d Cir. 1999).

at 76.  With respect to his work history, Plaintiff reported that he worked from September 1979 to March 1995 as a manager for the United Parcel Service, courier, bus operator, truck driver, and dock worker.  *See id*. at 83.  He reported no employment after March 1995.  The parties agree that, as of the alleged onset of disability through December 31, 2001, Plaintiff met the special insured status earnings requirements of the Act for purposes of establishing entitlement to disability insurance benefits.

1.   **Medical Evidence**

a.   **Evidence Relevant to the Period at Issue (March 15, 1996 to December 31, 2001)**

On October 10, 1994, Plaintiff underwent a magnetic resonance imaging test ("MRI") of the lumbosacral spine, which revealed early degenerative disc disease at the L3-L4 with straightening of the lumbar curvature.  *See id*. at 116.  There was no evidence of disc herniation or spinal stenosis.  *See id*.

On March 14, 1996, Plaintiff visited Dr. Robert Roe, complaining of "terrible headaches" that had persisted for one year.  *See id*. at 144.  He reported that his headaches were relieved with Tylenol and neck massages.  *See id*.  Dr. Roe found no clinical neurological deficit and was unable to determine the cause of Plaintiff's headaches.  *See id*. at 143.  He opined, however, that the cause may be due to cervical arthropathy or trauma.  *See id*.

4

Plaintiff returned to Dr. Roe in August 1996, complaining of neck pain. *See id*. at 146.  Plaintiff indicated that his neck pain may be related to an accident that occurred in 1994 where he was hit by another vehicle while driving a truck. *See id*.  He also indicated that he has trouble sleeping and suffers from back pain and that he attends therapy at the Hospital for Joint Disease. *See id*.  Dr. Roe found no clinical neurological deficit and diagnosed chronic neck pain. *See id*.  He prescribed Pamelor and recommended that Plaintiff undergo a cervical spine MRI. *See id*. at 145.

An MRI done on November 13, 1996 revealed early degenerative disc disease more marked from C2-3 to C4-5 with straightening of the cervical curvature. *See id*. at 115.  The MRI also revealed a central and right-sided herniation at the C3-4 disc that appeared chronic and deformed the anterior right aspect of the sac. *See id*.

On November 27, 1996, Plaintiff complained to Dr. Roe of severe neck pain when he attempted to lift a radiator to his shoulders. *See id*. at 148.  Dr. Roe reviewed the November 1996 MRI and diagnosed cervical disc disease, which, based on Plaintiff's history, became symptomatic as a result of his May 1994 motor vehicle accident. *See id*.  Dr. Roe advised Plaintiff to follow up with the orthopedist who was treating him for lower back pain. *See id*.

5

In December 1996, Plaintiff visited Dr. Ali E. Guy of Hudson Valley Physical Medicine and Rehabilitation. *See id*. at 118-20. Plaintiff complained of neck pain that radiated to the left upper extremity with numbness and tingling in his arm. *See id*. He also indicated that he had been experiencing lower back pain that radiated down the lower left extremity. *See id*. Upon physical examination of the Plaintiff, Dr. Guy found that his neck was diffusely tender with diffused spasm and a one-half lateral rotation. *See id*. The examination revealed diffuse tenderness in Plaintiff's back with diffused spasm, multiple trigger points present, and one-half normal extension. *See id*. Plaintiff's straight leg raising was 75 degrees with bilateral lower back pain. *See id*. Tests of Plaintiff's active range of motion and manual muscle power were within normal limits for all four extremities. *See id*. Dr. Guy provided the following assessment: (1) C3-C4 disc herniation; (2) rule out cervical radiculopathy; (3) rule out lumbar radiculopathy; (4) rule out lumbar disc bulge versus herniation; and (5) traumatic myofascial pain syndrome. *See id*. He prescribed Ultram and concluded that Plaintiff remained "totally disabled and unable to return to his former occupation as a truck driver." *Id*.

On March 10, 1997 Plaintiff returned to Hudson Valley Physical Medicine and Rehabilitation and was seen by Dr. Yehudian. *See id*. at 126. An examination revealed neck and back

6

muscle spasms and a decreased range of motion of the cervical and lumbar spine. *See id*. Plaintiff' reflexes were within normal limits and he had no focal neurological deficits. *See id*. In the carrier/employer billing form for Plaintiff's Worker's Compensation claim, Dr. Yehudian indicated that Plaintiff was totally disabled. *See id*. at 137.

Plaintiff underwent another MRI on March 24, 1997. *See id*. at 117. Like Plaintiff's October 1994 MRI, this MRI revealed minimal degenerative disc disease at L3-4 with straightening of the lumbar curvature. *See id*. There was no evidence of disc herniation or spinal stenosis. *See id*. Dr. Khoury, a radiologist, indicated that, when compared to Plaintiff's October 1994 MRI, there was no significant interval change. *See id*.

Dr. Yehudian examined Plaintiff on March 31, 1997 and conducted nerve conduction studies of both upper extremities, which revealed right C3-4 cervical radiculitis. *See id*. at 121-22. His examination showed that Plaintiff continued to have muscle spasms throughout his neck and upper back and several trigger points. *See id*. His range of motion decreased with rotations of the cervical spine to the right and external deviation of the cervical spine. *See id*. Plaintiff's reflexes were within normal limits and no focal neurological or sensory deficit was identified. *See id*. His strength in all four extremities was normal. *See id*.

On April 24, 1997, a physician at Hudson Valley Physical Medicine and Rehabilitation indicated the Plaintiff's neck was "getting better." *See id.* at 127.  At a follow-up visit four days later, Dr. Yehudian found muscle spasms and tenderness in Plaintiff's lower back, but no neurological dysfunction. *See id.* at 128.  Plaintiff was reevaluated at Hudson Valley Physical Medicine and Rehabilitation on June 27, 1997. *See id.* at 129. Plaintiff's range of motion in his back was decreased and his straight leg raising test was positive at 60 degrees. *See id.* Dr. Yehudian found no focal neurological deficits. *See id.*  On the Worker's Compensation form, Dr. Yehudian indicated that Plaintiff had a marked partial disability and was unable to do any type of work because he needed vocational retraining. *See id.* at 139.

At a September 5, 1997 visit, Plaintiff reported that he was still suffering from neck and back pain and that he had "good and bad days." *Id.* at 130.  An examination showed that Plaintiff had decreased range of motion in his neck and back, lumbosacral tenderness, and a "lesser degree" of muscle spasm. *Id.*

On February 2, 1998, Dr. Richard Freeman examined Plaintiff at the request of The State Insurance Fund. *See id.* at 308-11. Plaintiff reported that he had constant pain in his entire back radiating from the neck to the lumbar spine and intermittent pain radiating into both upper and both lower extremities. *See id.* at

309.  On physical examination, Plaintiff walked with a non-antalgic gait, stood erect with no list to either side, and got on and off the examination table without difficulty.  *See id*. Examination of the cervical spine revealed that Plaintiff had some limitations in his range of motion but that he was able to forward flex and extend his neck normally.  *See id*.  There was no spasm of the cervical paraspinal muscles.  *See id*.  A neurological examination of the upper extremities revealed no evidence of atrophy, motor deficit, or sensory deficit.  *See id*. Dr. Freeman found that Plaintiff had full flexibility in his lumbar spine with "end range pain referred to the lower lumbar area with extreme forward flexion."  *Id*. at 310.  Examination of Plaintiff's lower extremities revealed no neurological deficits. *See id*.  Dr. Freeman's impression was C3-4 disc herniation with cervical radiculopathy and lumbar sprain.  *See id*.  He concluded that there was a causal relationship between Plaintiff's May 16, 1994 accident and the diagnoses and that, as a result of his injuries, Plaintiff suffered from a moderate, partial disability. *See id*.

On August 28, 1998, Dr. Jeffrey Klein performed an anterior cervical diskectomy and spinal fusion of Plaintiff's C3-4 disc. *See id*. at 101.  Dr. Klein's post-operative diagnosis was cervical disc herniation and degenerative disc disease at C3-4. *See id*.

9

On August 28, 1998, Dr. Klein completed a report of
Plaintiff' condition and treatment.  *See id*. at 151-57.  Dr.
Klein provided a diagnosis of cervical disc herniation and
degenerative disc disease.  *See id*. at 151.  Dr. Klein noted
that, because Plaintiff had undergone surgery only two weeks
prior, it was too early to assess any continuing symptoms.  *See
id*. at 151.  He indicated that Plaintiff's treatment consisted of
physical therapy.  *See id*. at 152.  Dr. Klein reported that
Plaintiff's neurological signs were intact.  *See id*. at 152.
With respect to Plaintiff's limitations, Dr. Klein reported that
Plaintiff was "temporarily" limited to lifting, carrying,
pushing, and/or pulling up to 10 pounds.  *See id*. at 154.  He
further indicated that Plaintiff was limited to standing and/or
walking for up to four hours per day, but that, after six months,
he would not have any restrictions in standing or walking.  *See
id*.  Plaintiff had no limitations in the amount of time he could
sit.  *See id*.

Dr. Vijaya Doddi, a consulting orthopedist, examined
Plaintiff on December 30, 1998.  *See id*. at 158-61.  Plaintiff
complained of decreased range of motion in his neck since his
August 1998 surgery, numbness in his entire right foot four to
five times per day, pain in his hands and knees, and stiffness
when waking up in the morning.  *See id*. at 158.  Plaintiff stated
that he was unable to work due to his neck problems and chronic

10

pain, which he characterized as dull and constant. *See id*. In terms of daily living activities, Plaintiff reported that he is independent in basic activities, but complained of pain when lifting his son, who weighs approximately 20 pounds. *See id*. at 159. He stated that he was not currently working, but wanted to find a job as a paralegal. *See id*. He stated that he spends his free time with his family and doing housework when his girlfriend is working. *See id*.

Dr. Doddi's physical examination revealed that Plaintiff had a normal gait and station and had no difficulty getting on and off the examination table. *See id*. Plaintiff had limited range of motion in his cervical spine and moderate pain in his paracervical area, but no muscle spasms. *See id*. No abnormalities were found on examination of Plaintiff's upper extremities and his muscle strength was full. *See id*. at 160. Plaintiff had normal flexion, extension, lateral flexion and lateral rotation of his lumbar spine and there was no spinal tenderness or paraspinal muscle spasm. *See id*. Straight leg raising and Lasegue's sign were negative. *See id*. Dr. Doddi found no atrophy and no motor or sensory abnormality of the lower extremities. *See id*. No abnormalities with respect to range of motion or sensation were found in Plaintiff's lower extremities; although, Dr. Doddi noted that Plaintiff complained of numbness in his foot. *See id*. Plaintiff's cervical spine x-ray revealed

"degenerative 'lipping' anteriorly but with the vertebral body heights being maintained," minimal narrowing of the disc space at C2-3, "mild bony 'bridging'" at the C3-4 disc interspace, and straightening of the cervical lordotic curve. *Id*. at 162. An x-ray of the lumbar sacral spine revealed mild narrowing of the disc space at L4-5, moderate narrowing of the disc space at L5-S1, mild anterior degenerative lipping, and complete straightening of the lumbar lordotic curvature. *See id*. An x-ray of Plaintiff's right knee was unremarkable. *See id*.

Dr. Doddi provided the following impression: status post motor vehicle accident with neck injury; status post surgery to cervical spine with bone graft with limited range of motion of the neck; pain in both knees and hands, possibly due to osteoarthritis. *See id*. at 160. Dr. Doddi concluded that Plaintiff was unable to engage in prolonged standing, lifting, or sitting and could lift a maximum of ten to fifteen pounds, with proper biomechanics. *See id*. at 161.

On March 17, 1999, Dr. C. Ford, a state agency physician, reviewed the medical evidence in Plaintiff's record and provided an assessment of Plaintiff's physical residual functional capacity. *See id*. at 163-70. Dr. Ford opined that, in an eight-hour workday, Plaintiff could occasionally lift, carry, and/or pull ten pounds and could frequently lift, carry, and/or pull less than ten pounds. *See id*. at 164. He found that Plaintiff

could stand and/or walk for a total of at least two hours in an eight-hour workday and could sit for approximately six hours in a normal workday. *See id*. Dr. Ford found that Plaintiff was unlimited in his ability to push and/or pull, within the limits of his ability to lift and carry. *See id*. Dr. Ford also concluded that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. *See id*. at 165. In making his assessment, Dr. Ford noted Plaintiff's surgery and the findings set forth in Dr. Doddi's report. *See id*. at 164. On May 10, 1999, another state agency physician, Dr. S. Imam, reviewed Plaintiff's medical evidence and indicated that he agreed with Dr. Ford's assessment. *See id*. at 48, 170.

On July 15, 1999, Plaintiff saw Dr. Klein for a follow-up appointment. *See id*. at 173. Plaintiff complained of pain in his right buttock, thigh, and leg, which had worsened in the previous six months. *See id*. Plaintiff's neurological examination was normal and an x-ray of his cervical spine revealed that the C3-4 fusion had healed. *See id*. Dr. Klein's clinical impression was lumbar radiculitis. *See id*. On October 7, 1999, Plaintiff again complained to Dr. Klein of pain in his right thigh and leg. *See id*. at 174. Dr. Klein noted that there was no change in Plaintiff's physical examination and indicated that it was unclear whether Plaintiff's pain was due to lumbar radiculitis or a problem with his knee. *See id*.

13

On August 4, 1999, at the request of the State Insurance
Fund, Plaintiff was examined by consulting physician, Dr. Andre
Fethiere.  *See id*. at 180-84.  Plaintiff complained of pain in
the neck down to the mid-back with lifting, pain in the neck when
riding the subway and when turning his head while driving a car,
pain in his back during physical therapy with lifting and
carrying, which radiated down to his right foot.  *See id*. at 180.
On physical examination, Plaintiff's station and gait were
normal, there was no tenderness of the neck or hypertonicity or
spasm of the cervical musculature, and no atrophy or weakness in
the muscles of the upper extremities.  *See id*. at 182.  Plaintiff
reported a decreased sensation to pin prick over the C4-5
dermatome.  *See id*.  On examination of the dorsal lumbosacral
spine, Plaintiff reported tenderness at the level of D8-9 and at
the lumbosacral notch.  *See id*.  There was no paravertebral
tenderness or tenderness at the sciatic notch.  *See id*.  Dr.
Fethiere's examination of Plaintiff's right knee revealed no
effusion.  *See id*.  Plaintiff reported some tenderness at the
medial and lateral joint lines.  *See id*.  Dr. Fethiere gave the
following diagnoses: (1) status post anterior interbody fusion of
C3-4; (2) low back derangement with mild right lumbar
radiculopathy; (3) underlying spondylosis; and (4) internal
derangement of the right knee.  *See id*. at 182-83.  Dr. Fethiere
concluded that Plaintiff had a moderate partial disability.  *See*

14

*id*. at 183.

Plaintiff saw Dr. Edward Adler on October 11, 1999 with complaints of knee pain. *See id*. at 179. On examination, Plaintiff's gait was smooth and he complained of diffuse tenderness with full range of motion. *See id*. There was no effusion and x-rays of the knees were unremarkable. *See id*. Dr. Adler diagnosed Plaintiff with meniscal tears and chondromalacia of both knees. *See id*. Dr. Adler opined that Plaintiff was partially disabled. *See id*. at 325.

Dr. Patrick V. McMahon, an orthopedic surgeon, examined Plaintiff on November 19, 1999, in connection with Plaintiff's Worker's Compensation claim. *See id*. at 335-37. On examination, Dr. McMahon found no vertebral tenderness or paravertebral spasm in the cervical spine; full range of motion in Plaintiff's shoulders, elbows, wrists, hands, hips, and knees with no tenderness, heat, swelling, erythema, or effusion; full muscle strength in Plaintiff's upper and lower extremities with normal reflexes and no evidence of muscle atrophy; normal sensation and a normal gait. *See id*. at 336-37. Based on his examination and a review of medical records, Dr. McMahon diagnosed status post neck fusion C3-4, low back pain, and bilateral knee pain. *See id*. at 337. He opined that Plaintiff has a mild orthopedic disability and could return to work with restrictions to lifting no more than fifteen pounds. *See id*.

Plaintiff had an MRI performed on his right knee on December 27, 1999, which revealed a torn medial meniscus and small joint effusion. *See id*. at 186. A January 6, 2000 MRI of Plaintiff's left knee showed an osteochondral lesion, no definite meniscal tear, minimal joint effusion, and a small popliteal cyst. *See id*. at 185. At an examination with Dr. Adler on January 12, 2000, Plaintiff complained of continued pain in both knees. *See id*. at 189. Dr. Adler noted the MRI findings and requested authorization for arthroscopic surgery on both knees. *See id*. He concluded that Plaintiff remained disabled. *See id*. Dr. Adler examined Plaintiff again on February 23, 2000. *See id*. at 192. His findings remained unchanged. *See id*.

On January 6, 2000, per referral by Dr. Klein, Plaintiff was seen by Dr. Enrico Fazzini, a neurologist. *See id*. at 194-95. Examination revealed "4+/5 weakness of the right deltoid, triceps and bilateral quadriceps muscles and right hand grip with decreased pinprick sensation in the right C56 and left C78 and right S1 distribution." *Id*. at 194. Plaintiff's reflexes were diminished on his left triceps and right ankle jerk and his gait was slow. *See id*. Dr. Fazzini found bilateral paraspinal muscle spasms with decreased cervical and lumbar range of motion by twenty percent. *See id*. Plaintiff also had decreased range of motion with pain in the right shoulder and in both knees. *See id*. Nerve conduction studies performed by Dr. Fazzini, pursuant

to Worker's Compensation authorization, on February 10, 2000 revealed right C5-6, right L4-5, and left S1 radiculopathy. *See id*. at 188. Dr. Fazzini indicated in his report that Plaintiff was "permanently[,] almost totally disabled" and that he would need lumbar spine surgery. *Id*.

On November 28, 2000, Dr. Adler performed arthroscopic surgery on Plaintiff's right knee, which consisted of a partial medial meniscectomy. *See id*. at 332. At a subsequent appointment with Dr. Adler on December 4, 2000, Plaintiff complained of discomfort in his right knee. *See id*. at 322. He also indicated that, over the previous weekend, he had experienced a great deal of pain in his back and went to the emergency room. *See id*. He also stated that his back "does not bother him much anymore." *Id*. On January 3, 2001, Plaintiff reported to Dr. Adler that he had injured his right knee in a fall and was experiencing some pain. *See id*. at 321. He also noted that he continued to have pain in his left knee. *See id*. Dr. Adler noted that Plaintiff was scheduled for surgery on his left knee in early February. *See id*. Dr. Adler performed arthroscopic knee surgery on Plaintiff's left knee on February 6, 2001. *See id*. at 328-29. At his post-operative visit on February 12, 2001, Plaintiff complained of some discomfort and difficulty using stairs. *See id*. at 319. Plaintiff had full extension of the left knee and there was no effusion. *See id*.

17

On March 26, 2001, Plaintiff reported to Dr. Adler that he had pain in both knees and difficulty squatting and getting in and out of chairs.  *See id*. at 317.  Examination of both knees revealed full range of motion and no effusion.  *See id*.  There was some tenderness in both knees and crepitus in the left knee on motion.  *See id.*

Dr. Adler next saw Plaintiff on June 25, 2001.  *See id*. at 316.  Plaintiff continued to experience pain in both knees and difficulty using stairs.  *See id*.  On examination, Plaintiff's gait was smooth and he was able to get on and off the examination table without assistance.  *See id*.  Plaintiff's knee range of motion was to 125 degrees bilaterally and there were no effusions.  *See id*.  Dr. Adler found crepitus in both knees with retropatellar tenderness.  *See id*.  He referred Plaintiff to physical therapy and opined that Plaintiff had some chondromalacia that was causing the pain and stiffness in the knees.  *See id*.  On September 17, 2001, Plaintiff reported to Dr. Adler that he continued to have pain in both knees.  *See id*. at 316.  Dr. Adler found full range of motion in both knees, diffuse tenderness bilaterally, and no effusion, instability, crepitus, weakness, or atrophy of the quadriceps and calves.  *See id*.

During the course of his treatment of Plaintiff, Dr. Adler referred Plaintiff to Dr. Y. Kim for his back pain.  *See id*. at 320.  Plaintiff first saw Dr. Kim on January 18, 2001.  *See id*.

Physical examination revealed that Plaintiff was neurologically intact.  *See id*.  Dr. Kim found diffuse paraspinal tenderness along the upper and lower lumbosacral region associated with markedly decreased range of motion of the lumbosacral spine on flexion, extension, and lateral bending.  *See id*.  Dr. Kim's impression was chronic low back pain.  *See id*.  He recommended a repeat MRI of Plaintiff's lumbosacral spine.  *See id*.  On February 22, 2001, Plaintiff reported to Dr. Kim that he continued to have persistent pain in his back, but that his right leg pain had improved following arthroscopic surgery.  *See id*. at 318.  Dr. Kim's findings on physical examination of Plaintiff remained unchanged.  *See id*.  Dr. Kim saw Plaintiff again on October 11, 2001.  *See id*. at 314.  Dr. Kim noted that Plaintiff had undergone a repeat MRI and that it did not appear to have changed from his previous MRI.  *See id*.  The MRI revealed minimal degeneration of the disc at L4-5 and L3-4.  *See id*.  There was no evidence of disc herniation or arthritis.  *See id*.  Dr. Kim concluded that Plaintiff was a "nonoperative candidate" for his spinal complaints and that Plaintiff would benefit from a spinal rehabilitation program to enable him to return to work.  *See id*.

> **b.   Evidence from the Time After the Period at Issue (from December 31, 2001)**

Plaintiff returned to Dr. Adler on April 1, 2002 for an orthopedic Worker's Compensation follow-up evaluation.  *See id*.

at 313.  Plaintiff continued to complain of pain in his knees.
*See id*.  Dr. Adler found that Plaintiff's gait was smooth, but
somewhat stiff and that he was able to get on and off the
examination table without difficulty.  *See id*.  Plaintiff had
full range of motion in his knees and could squat slowly, but
needed assistance getting up from a squatted position.  *See id*.
There was no effusion or instability, but there was peripatellar
tenderness in both knees with some crepitus.  *See id*.  Dr. Adler
diagnosed chondromalacia.  *See id*.

On April 18, 2002, Plaintiff was evaluated by Dr. Wilson of
the Central Bronx Orthopaedic Group, apparently in connection
with his Worker's Compensation claim.  *See id*. at 338-39.
Plaintiff's complaints concerned only his knees.  *See id*. at 338.
Dr. Wilson examined Plaintiff's knees and found significant joint
line tenderness and no effusion in Plaintiff's right knee.  *See
id*.  Plaintiff's right knee had parapatellar tenderness with some
patellofemoral crepitus and a good range of motion.  *See id*.
There was moderate atrophy in his quadricep.  *See id*.
Plaintiff's left knee was similar to the right, but had no joint
line tenderness.  *See id*.  X-rays of both knees revealed no
degenerative changes and well-maintained joint spaces.  *See id*.
Dr. Wilson's assessment was anterior knee pain or chondromalacia
patella.  *See id*.  He recommended a course of patellar bracing.
*See id*. at 339.

Plaintiff saw Dr. Wilson again on May 16, 2002 with continued complaints of pain in his right knee. *See id*. at 340. Plaintiff reported that the knee brace did not provide significant relief and that he had been experiencing persistent lower back pain localized to the right sciatic region. *See id*. Physical examination revealed good range of motion in the right knee with mild parapatellar tenderness, patellofemoral crepitus, and moderate quad atrophy. *See id*. Dr. Wilson diagnosed right knee chondromalacia and right sciatic radiculopathy and opined that Plaintiff would require further surgery on his right knee. *See id*.

Plaintiff saw another doctor from the Central Bronx Orthopaedic Group, Dr. Onesti, on October 24, 2002. *See id*. at 343. Examination revealed impingement in Plaintiff's right shoulder with evidence of subacromial bursitis and possible rotator cuff syndrome. *See id*. X-rays showed a solid fusion at C3-4 with good alignment. *See id*. Dr. Onesti noted that there was no indication for additional surgery on Plaintiff's neck. *See id*.

The latest record is from an October 31, 2002 examination by Dr. Wilson. *See id*. at 341-42. At this visit, Plaintiff complaint of pain localized to the medial aspect of his right knee joint, left knee pain, right shoulder pain, and marked difficulty with overhead function. *See id*. at 341. On

21

examination of Plaintiff's right knee, Dr. Wilson found tenderness over the medial joint line, no lateral joint line tenderness, no effusion and good range of motion. *See id*. Examination of the left knee revealed few areas of tenderness, good range of motion, and mild quad atrophy. *See id*. There were typical findings of impingement in Plaintiff's right shoulder. *See id*. X-rays of the right knee revealed few degenerative changes with well-maintained joint spaces and neutral alignment. *See id*. An MRI of the right knee showed a tear of the posterior horn of the medial meniscus and an MRI of the left knee revealed degeneration of the lateral meniscus with no frank tears present. *See id*. Dr. Wilson's assessment was recurrent tear of the right knee medial meniscus status post motor vehicle accident, left knee chondromalacia, and right shoulder impingement syndrome. *See id*. Dr. Wilson administered a cortisone injection to Plaintiff's right shoulder. *See id*. He concluded that Plaintiff's right knee would require further surgery. *See id*.

   **2.   Hearing Testimony**

   On December 20, 1999, Plaintiff appeared without an attorney and testified at a hearing before the ALJ. *See id*. at 24-46. Plaintiff testified that he last worked in 1996 as a part-time fork lift operator. *See id*. at 30. Plaintiff indicated that he only worked one day a week. *See id*. In May 1994, while working as a truck driver, he was involved in a head-on collision with

22

another vehicle while on the job.  *See id*.  He indicated that, since he last worked, he has been staying at his girlfriend's home and taking care of their two-year old son.  *See id*. at 36. He also indicated that he spends time attending Worker's Compensation hearings, going to doctors' appointments, and looking for a job.  *See id*. at 32.  He has applied for jobs with the postal service and the Westchester Bus Service, but failed the physical examinations for both jobs.  *See id*. at 32-33. Plaintiff testified that he used public transportation to get to and from his medical appointments and could drive for up to one hour.  *See id*. at 33-35.

Plaintiff testified that his August 1998 neck operation did not improve his condition and he had felt better before the operation.  *See id*. at 36-37.  With respect to his knee problems, Plaintiff indicated that he experiences pain from his kneecaps all the way down to his feet and has difficulty walking and climbing stairs.  *See id*. at 41.

At the December 11, 2002 hearing, Plaintiff appeared with his attorney and testified.  *See id*. at 214-35.  At the outset of the hearing, the ALJ and Plaintiff's attorney agreed that the physicians from whom they were directed by the Appeals Council on remand to obtain updated reports, Dr. Freeman and Dr. McMahon, were non-treating physicians and that the medical file was complete.  *See id*. 216.

Plaintiff testified that, since the first hearing, he had surgery in both of his knees. *See id*. at 219-20.  He stated that the surgeries did not help and that he was scheduled for further surgery on his right knee. *See id*. at 220.  He also indicated that he continued to have pain and spasms in his lower back when sitting in one place for too long. *See id*. at 221-22.  Plaintiff further testified that he continued to experience radiating pain in the cervical area of his spine and that he takes Vioxx for the pain, but with little relief. *See id*. at 222-23.  Plaintiff stated that, due to his shoulder injury, he was severely limited in the use of his right arm. *See id*. at 224.  He demonstrated the extent to which he could lift his right arm and the ALJ estimated that he could lift it approximately ten to fifteen degrees. *See id*. at 225-26.  Plaintiff testified that, since the first hearing, his condition has worsened. *See id*. at 230.  He indicated that, with the exception of his daily trips to his mother's house, he is homebound. *See id*. at 228.  He further stated that, before his 1998 surgery, he could walk at least seven or eight blocks without pain, but now he could only walk one or two blocks. *See id*. at 231.  Plaintiff testified that, in addition to Vioxx, he was currently taking Vicodin and B-Extra. *See id*. at 233.

**B.**   **Decisions of the ALJ and Appeals Council**

On December 18, 2002, the ALJ issued a decision finding that

the Plaintiff was not disabled within the meaning of the Act and, therefore, not entitled to disability insurance benefits. *See id*. at 206-13.  Plaintiff filed objections to the ALJ's decision to the Appeals Council. *See id*. at 201-02.  In March 2004, the Appeals Council rejected Plaintiff's exception, rendering the ALJ's decision the final decision of the Commissioner. *See id*. at 199-200.

In January 2005, Plaintiff filed a motion for judgment on the pleadings in this Court,[3] arguing that ALJ erroneously applied the treating physician rule.  The Commissioner subsequently filed a cross-motion for judgment on the pleadings.

## II.   **APPLICABLE LEGAL PRINCIPLES**

### A.   **Standard of Review**

Rule 12(c) of the Federal Rules of Civil Procedure states that a party is entitled to judgment on the pleadings if he or she establishes that no material facts are in dispute and that he or she is entitled to judgment as a matter of law. *See Oneida Indian Nation v. City of Sherril,* 337 F.3d 139, 152 (2d Cir. 2003); *Morcelo v. Barnhart*, No. 01 Civ. 0743, 2003 WL 470541, at

---

[3]  The Plaintiff's motion is not reflected on the docket sheet and there is not an original copy of the motion in the Court's file.  In February 2007, however, Plaintiff submitted to the undersigned copies of the motion and memorandum of law, which are dated January 24, 2005.  While the docket sheet indicates that the motion was never filed, it is apparent that the Commissioner received the motion because she filed a cross-motion in March 2005.

*4 (S.D.N.Y. Jan. 21, 2003).  The scope of review in an appeal
from a social security disability determination involves two
levels of inquiry.  First, the court must review the
Commissioner's decision to determine whether the Commissioner
applied the correct legal standard when determining that the
plaintiff was not disabled.  *See Tejeda v. Apfel,* 167 F.3d 770,
773 (2d Cir. 1999).  Failure to apply the correct legal standard
is grounds for reversal of the ruling with no second level of
inquiry.  *See Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.
1984).  Second, the court must decide whether the Commissioner's
decision was supported by substantial evidence.  *See Green-
Younger v. Barnhart,* 335 F.3d 99, 105-06 (2d Cir. 2003).
"Substantial evidence means such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion."  *Id*. at 106 (internal citations omitted).  When
determining whether substantial evidence supports the
Commissioner's decision, it is important that the court
"carefully consider[] the whole record, examining evidence from
both sides."  *Tejada,* 167 F.3d at 774 (citing *Quinones v. Carter,*
117 F.3d 29, 33 (2d Cir. 1997).  "It is not the function of a
reviewing court to decide *de novo* whether a claimant was
disabled."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999).
Therefore, if the Commissioner applies the correct legal standard
and the "decision rests on adequate findings supported by

evidence having rational probative force, [this Court cannot] substitute [its] own judgment for that of the Commissioner." *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002).

**B.    Determining Disability**

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In determining whether an individual is disabled within the meaning of the Act, the Commissioner must consider "the combined effect of all of the individual's impairments." *Id.* at § 423(d)(2)(B).  Such impairments must be

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* at § 423(d)(2)(A).  When making this determination, the Commissioner must examine certain facts, including, "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)(*per curiam*).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  *See* 20 C.F.R. § 416.920(a)(4). First, the Commissioner will find that the claimant is not disabled unless the claimant can show that he is not working in "substantial gainful activity."  *Id*. at § 416.920(a)(4)(i), (b). Second, the medical severity of the claimant's impairments must be considered.  *Id*. at § 416.920(a)(4)(ii).  The claimant's impairment will not be deemed severe "[i]f [he] do[es] not have any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities."  *Id*. at § 416.920(c).  Third, if it is found that the claimant's impairments are severe, the Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, which are listed in appendix 1 of to Part 404, Subpart P of the Social Security regulations.  *See id*. at § 416.920(a)(4)(iii), (d).  If the claimant's impairments are not on the list, the Commissioner proceeds to the fourth step and assesses the claimant's residual functional capacity to determine whether he can do his past relevant work.  *See id*. at § 416.920(a)(4)(iv), (e)-(f).  Finally, if it is found that the claimant cannot do his past relevant work, the Commissioner will consider the claimant's residual functional capacity, age,

education, and work experience to see if he can make an adjustment to other work.  *See id*. at § 416.920(a)(4)(v), (g). The claimant bears the burden of proof on the first four steps of this analysis.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he need not proceed with the remaining steps.  *See Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work.  *See DeChirico*, 134 F.3d at 1180.

In analyzing a claimant's impairments, an ALJ "has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits."  *Pogozelski v. Barnhart*, No. 03 CV 2914, 2004 WL 1146059, at *10 (E.D.N.Y. May 19, 2004).  "The ALJ's duty to assist a claimant in obtaining complete medical records works in tandem with the so-called 'treating physician rule,' which requires the ALJ to grant controlling weight to the opinion of a claimant's treating physician if the opinion is well supported by medical findings and is not inconsistent with other substantial evidence."  *Rosado v. Barnhart*, 290 F.Supp.2d 431, 438 (S.D.N.Y. 2003).

## III.   DISCUSSION

The ALJ properly applied the five-step sequential analysis

set forth in the regulations.  First, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since March 15, 1996 and that his impairments were "severe" within the meaning of the Act.  *See* AR at 207-08.  Next, the ALJ found that Plaintiff's impairments were not severe enough to meet the medical criteria of any of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations. He stated, "The claimant . . . does not have clinical or laboratory findings of an impairment that meets or medically equals in severity the criteria of any impairment set forth in the Listings."  *Id*. at 208.  The Plaintiff does not dispute this determination and it is supported by substantial evidence in the record.

The ALJ then analyzed Plaintiff's residual functional capacity and considered whether it would allow Plaintiff to do his past relevant work or any other work that exists in significant numbers in the national and regional economies.  *See id*. at 208.  He concluded that Plaintiff's residual functional capacity would not allow him to perform his past relevant work, but that he retained the ability to perform the full range of sedentary work as defined by the Social Security regulations.[4]

_____

[4]  The Social Security regulations provide the following definition of "sedentary work":

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying

*See id*. at 207, 211.

There is substantial evidence in the record to support the ALJ's conclusion that Plaintiff retained the residual functional capacity to perform sedentary work.  With respect to Plaintiff's complaints of back and neck pain, the ALJ gave significant weight to the findings of Plaintiff's treating orthopedic surgeon, Dr. Klein, which he made after performing a cervical discectomy on Plaintiff.  In his August 1998 report, Dr. Klein indicated that Plaintiff was "temporarily" limited to lifting, carrying, pushing, and pulling up to ten pounds and to standing and/or walking up to four hours in a regular workday.  *Id*. at 154.  Dr. Klein noted that, after six months, there would be no limit to the amount of time that he could stand and/or walk.  *See id*.  He reported that Plaintiff had no limitations in the amount of time that he could sit.  *See id*.  Dr. Klein reported consistent findings upon examination of Plaintiff on July 15, 1999 and October 7, 1999.  *See id*. at 173-74.  The ALJ afforded great weight to Dr. Klein's opinion because it was well-supported by medically accepted clinical and laboratory diagnostic techniques

---

articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 1567(a).

and by Dr. Klein's well-established relationship with Plaintiff. *See id*. at 209.

The ALJ noted that Dr. Klein's findings were consistent with treating orthopedist Dr. Adler's October 11, 1999 assessment of Plaintiff, in which he reported that Plaintiff's gait was smooth and that there was tenderness in his knees, but no effusion, and diagnosed Plaintiff with meniscal tears and chondromalacia of both knees. *See id*. at 179, 210. The ALJ further stated that Dr. Klein's opinion did not contradict the assessment of consulting physician Dr. Fethiere, who opined that, for the purpose of Plaintiff's Worker's Compensation claim, Plaintiff suffered from a moderate partial disability. *See id*. at 210. As the ALJ correctly explained, the standard for determining disability in the context of Worker's Compensation claims is different than the standard that applies in the Social Security context. In the Worker's Compensation context, the disability determination goes to whether the claimant is capable of performing the functions and duties of his prior employment and does not take into consideration the claimant's ability to do other employment. *See Boryk v. Barnhart*, No. 02 Civ. 2465, 2003 WL 22170596, at *1, n.3 (E.D.N.Y. Sept. 17, 2003); *De Jesus v. Chater*, 899 F.Supp. 1171, 1177-78 (S.D.N.Y. 1995). Thus, Dr. Klein's findings are not inconsistent with Dr. Fethiere's disability determination.

The ALJ also relied on the residual functional capacity assessments of non-examining state agency physicians, Drs. Ford and Imam.  *See id*. at 211.  Opinions of non-examining sources can constitute substantial evidence if they are consistent with other evidence in the record.  *See Diaz v. Shahala*, 59 F.3d 307, 313, n.5 (2d Cir. 1995).  The ALJ correctly held that Dr. Ford's assessment, agreed to by Dr. Imam, was supported by evidence in the record.

Dr. Doddi's examination findings and impressions further support the ALJ's conclusion that Plaintiff is capable of performing sedentary work.  Other than the limited range of motion and moderate pain found in Plaintiff's cervical spine, Dr. Doddi's findings on physical examination of Plaintiff were normal.  *See id*. at 159-60.  Dr. Doddi concluded that Plaintiff was unable to engage in *prolonged* standing, lifting, or sitting and that he could lift a maximum of ten to fifteen pounds with proper biomechanics.  *See id*. at 161.

Dr. McMahon's findings also are consistent with other evidence in the record and the ALJ's decision.  He examined Plaintiff and found no vertebral tenderness or paravertebral spasm in the cervical spine; full range of motion in Plaintiff's shoulders, elbows, wrists, hands, hips, and knees with no tenderness, heat, swelling, erythema, or effusion; full muscle strength in Plaintiff's upper and lower extremities with normal

reflexes and no evidence of muscle atrophy; normal sensation and a normal gait. *See id.* at 336-37. Consistent with other residual functional capacity assessments in the record, Dr. McMahon concluded that Plaintiff could return to work with restrictions to lifting no more than fifteen pounds. *See id.* at 337. Plaintiff asserts in his memorandum of law that the ALJ failed to take this limitation into consideration. *See* Plaintiff's Memo. of Law at 4. While the ALJ did not explicitly refer to this portion of Dr. McMahon's report, the restriction noted by Dr. McMahon supports the ALJ's finding that Plaintiff was capable of performing sedentary work, which requires lifting up to ten pounds. *See id.* at 211. Although Dr. McMahon stated that Plaintiff had a mild orthopedic disability, like all other disability determinations included in the medical records, this finding was made in the context of Plaintiff's Worker's Compensation claim and, thus, has no bearing on whether Plaintiff is disabled within the meaning of the Social Security laws and regulations.

With respect to Plaintiff's knee impairments, the ALJ declined to give any weight Dr. Adler's finding that Plaintiff was disabled. *See id.* at 210. As the ALJ correctly noted, Dr. Adler's opinion was given to the State Insurance Fund in the context of Plaintiff's Worker's Compensation proceedings, where there is a more limited definition of disability. *See id.*

Moreover, the determination of whether a claimant is disabled is reserved to the Commissioner and a treating source's opinion that a claimant is disabled is not itself determinative of the ultimate issue of disability.  *See* 20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  Thus, the ALJ did not err in refusing to give controlling weight to Dr. Adler's conclusion as to Plaintiff's disability status.  The ALJ, however, did take into account clinical findings concerning Plaintiff's knees and held that Dr. Adler's opinion that Plaintiff was disabled was contradicted by such findings.  *See* AR at 210.  These findings established that Plaintiff had a torn medial meniscus, small joint effusion, and some tenderness in his right knee, *see id*. at 182, 186, and osteochondritis diseccans and minimal joint effusion in his right knee.  *See id*. at 185. After Plaintiff's knee surgeries, Dr. Adler consistently reported that Plaintiff had full range of motion in both knees with no effusion or instability, some tenderness, and some crepitus.  *See id*. at 313, 315-17, 321-22.  In April 2002, Dr. Adler recommended that Plaintiff, join a gym, use a stationary bike, and "walk around as much as possible."  *Id*. at 313.

With respect to the medical opinion of Dr. Fazzini that Plaintiff was "permanently almost totally disabled," the ALJ gave no weight to this opinion, finding that Dr. Fazzini was a nontreating source and that his opinion was also addressed to

35

Plaintiff's claim for Worker's Compensation benefits.  *See id.*
He found Dr. Fazzini's opinion to be conclusory in that it did
not provide specifics as to Plaintiff's physical limitations at
that point in time.  *See id.*

Plaintiff contends that the ALJ improperly applied the
treating physician rule.  He asserts that the ALJ improperly
considered Dr. Fazzini a non-treating physician and, thus, did
not give controlling weight to his finding that Plaintiff was
"permanently almost totally disabled."  AR at 195.  The Social
Security regulations define "treating source" as the claimant's
"own physician, psychologist, or other acceptable medical source
who provides [claimant], or had provided [claimant], with medical
treatment or evaluation and who has, or has had, an ongoing
treatment relationship with [claimant]."  20 C.F.R. § 404.1502.
An "nontreating source" is defined as "a physician, psychologist,
or other acceptable medical source who has examined [claimant]
but does not have, or did not have, an ongoing treatment
relationship with [claimant]."  *Id.*  A claimant's relationship
with an acceptable medical source will be considered an ongoing
treatment relationship "when the medical evidence establishes
that [claimant] see[s], or ha[s] seen, the source with a
frequency consistent with accepted medical practice for the type
of treatment and/or evaluation required for [his] medical
condition(s)."  *Id.*  The record establishes that Plaintiff only

36

saw Dr. Fazzini twice.  The length of time that Plaintiff has suffered with his back and neck impairments and the frequency with which he has seen other treating physicians for these conditions, such as Dr. Klein, suggests that two visits is not consistent with type of treatment and evaluation required for his condition.  Thus, the ALJ did not err in declining to consider Dr. Fazzini to be a treating source.

The ALJ's decision to not credit Dr. Fazzini's opinion as to Plaintiff's status as disabled is further supported by other factors.  First, as the ALJ noted, Dr. Fazzini's opinion was addressed to Plaintiff's claim for Worker's Compensation benefits.  Second, as explained above, a medical source's opinion as to the ultimate determination of disability is not binding on the ALJ.  *See Snell*, 177 F.3d at 133.  Third, Dr. Fazzini's opinion was not supported by any specific findings as to Plaintiff's functional limitations.  Plaintiff disputes this in his motion, arguing that, in the second paragraph of Dr. Fazzini's report, he "spells out numerous restrictions." Plaintiff's Memo. of Law at 5.  In this portion of his report, Dr. Fazzini set forth his findings on physical examination of Plaintiff.  *See* A.R. at 194.  Nowhere in his report, however, did Dr. Fazzini indicate how these findings translated into functional limitations of the Plaintiff.  Finally, Dr. Fazzini's conclusion that Plaintiff would need lumbar spine surgery is

37

contradicted by a report from one of Plaintiff's treating orthopedists, Dr. Kim.  In October 2001, Dr. Kim compared the results of Plaintiff's 1999 MRI and an MRI done just prior to the examination and concluded that Plaintiff was a "nonoperative candidate" for spine surgery.  *Id*. at 314.  Accordingly, the ALJ did not err in refusing to give weight to Dr. Fazzini's opinion.

With respect those medical records relating to medical observations in 2002, the ALJ found that, because they concern Plaintiff's medical condition after the date he was last insured and because Plaintiff failed to establish that he was disabled on or prior to December 31, 2001, they were not directly relevant to the evaluation except to the extent that they address Plaintiff' condition prior to 2002.  *See id*. at 212.  He noted that, while these records mention Plaintiff's problem with his shoulder and his right knee, they do not offer specific limitations in physical functioning prior to 2002.  *See id*.

In finding that Plaintiff could perform sedentary work, the ALJ considered Plaintiff's testimony and found that it was not fully consistent with the objective medical evidence or with the reports of Plaintiff's treating physicians.  *See id*. at 208-09.  The ALJ pointed out specific portions of Plaintiff's testimony at both hearings and stated, "[t]he [Plaintiff]'s medical history certainly shows objective [evidence] of cervical and knee problems; however, the medical record does not disclose any

evidence that would suggest that the claimant has been rendered 'homebound' or that he has lost the substantial use of his right arm." *Id*. at 209. The ALJ provided the following assessment:

> I have considered claimant's demeanor while testifying and his subjective complaints of pain and other symptoms in accordance with Social Security [Ruling] 96-7p and have concluded that these descriptions are out of proportion and not justified or reasonable to the impairments established by the medical findings in the record and are not supported by the objective clinical findings contained in the record. There is certainly nothing in any report he gave to any physician that would even remotely corroborate a six-year "homebound" status (or such a status for any period of time) or an inability to use his dominant arm (at all!). It is evident to the trier of fact that the claimant tends to exaggerate the extent of his limitations. The medical impairments are not of such severity or intensity so as to preclude all work activities. The claimant[] admits (at least) to being able to sit for one hour at a time, can drive a car at least 1 hour to his weekend home in Pennsylvania & can take public transportation. He requires minimal pain medication and was able to provide daily care for his infant child (6 months old) for the better part of 19[9]8 (prior to his surgery). He testified that he could walk on level ground but has difficulties with steps. On the other hand, he testified at Hearing I that he was able to travel from his home in Mount Vernon by train/subway to visit treating physicians in Brooklyn (the ALJ notes that taking a subway requires negotiating a significant amount of stairs) and was also able to travel 1 1/4 hour by car to his "summer" home in Pennsylvania. Overall, I find the subjective complaints of pain credible only to the extent set forth in the following paragraph.
>
> Based on a longitudinal consideration of the entire record and after considering the claimant's demeanor while testifying, I find the claimant (despite his impairments) has been able on a sustained basis in a work environment during the period in question to sit for a total of up to and including eights hours and stand/walk a total of up to and including four hours during the course of an 8-hour work day; and has had

the ability occasionally to lift and carry objects
weighing up to and including ten pounds.  This would
be consistent with the ability to perform sedentary
work.

*Id.* at 210-11.

It is well within the discretion of the Commissioner to

evaluate the credibility of Plaintiff's allegations and render an

independent decision as to the true extent of Plaintiff's pain in

light of the medical findings and other evidence.  *See Mimms v.*

*Heckler*, 750 F.2d 180, 186 (2d Cir. 1984).  The regulations

provide that, "[i]n determining whether you are disabled, we

consider all your symptoms, including pain, and the extent to

which your symptoms can reasonably be expected as consistent with

the objective medical evidence and other evidence."  20 C.F.R. §

404.1529(a).  When an individual has a medically determinable

impairment that could reasonably be expected to produce the

symptoms alleged, but the objective evidence alone cannot

substantiate the alleged intensity and persistence of the

symptoms, the ALJ considers other factors in assessing subjective

symptoms, including: (1) the individual's daily activities; (2)

the location, duration, frequency, and intensity of the

individual's pain or other symptoms; (3) factors that precipitate

and aggravate the symptoms; (4) the type, dosage, effectiveness,

and side effects of any medication the individual takes or has

taken to alleviate pain or other symptoms; (5) treatment, other

than medication, the individual receives or has received for

relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ, here, properly followed § 404.1529 of the regulations and Social Security Ruling 96-7p, by analyzing Plaintiff's daily activities, his pain, his use of medication, and the treatment he had received to determine that Plaintiff's claims were not supported by the evidence and contradicted by the level of his activities and the medical findings.  The Court should defer to the ALJ's determination that Plaintiff's subjective complaints were not credible as it is supported by objective evidence in the record.

Based on his assessment of Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff would not be able to perform his past relevant work.  *See* AR at 211.  Next, considering Plaintiff's residual functional capacity in conjunction with his age, education, and work experience, the ALJ held that, pursuant to Rule 201.21 of the Medical-Vocational Guideline Rules (found at 20 C.F.R. Part 404, Appendix 2 to Subpart P) (the "grids"), Plaintiff was not disabled.[5]  *See id.*

---

[5]  At the end of the relevant period, Plaintiff was 49 years old.  *See* A.R. at 69 (noting Plaintiff's date of birth as December 8, 1952).  He testified that he went to college.  *See*

41

at 211-12.  As noted above, at the fifth step of the disability inquiry, the Commissioner bears the burden of proving that the claimant can perform other work.  *See DeChirico*, 134 F.3d at 1180.  Courts have held that, if the claimant suffers from only exertional limitations, the Commissioner may satisfy this burden by resorting to the grids.  *See Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996).  "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled."  *Id.* at 39.  Because Plaintiff suffers from only exertional impairments, resort to the grids was appropriate.  According to the grids, based on Plaintiff's ability to do sedentary work, and his age, education, and work experience, he is not disabled within the meaning of the Act.

Accordingly, I find that the ALJ's determination that Plaintiff was not disabled is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that your Honor grant the Commissioner's motion, deny the Plaintiff's motion, and affirm the decision of the ALJ.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ .P., the parties shall have ten (10) days,

---

*id.* at 39.

plus an additional three (3) days, pursuant to Rule 6(e), Fed. R.
Civ. P., or a total of thirteen (13) working days, (*see* Rule
6(a), Fed. R. Civ. P.), from the date hereof, to file written
objections to this Report and Recommendation.  Such objections,
if any, shall be filed with the Clerk of the Court, with extra
copies delivered to the chambers of The Honorable Colleen
McMahon, at the United States Courthouse, 500 Pearl Street, Room
640, New York, New York 10007, and to the chambers of the
undersigned at Room 434, 300 Quarropas Street, White Plains, New
York 10601.

Failure to file timely objections to the Report and
Recommendation will preclude later appellate review of any order
to judgment that will be entered by Judge McMahon.  *See Thomas v.
Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d
Cir.), cert. denied 113 S. Ct. 825 (1992); *Small v. Secretary of
H.H.S.*, 892 F.2d 15,16 (2d Cir. 1989) (*per curiam*); *Wesolek v.
Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988).  Requests for
extensions of time to file objections must be made to Judge
McMahon and should not be made to the undersigned.

Date: April 9 , 2007
White Plains, New York

Respectfully submitted,

_____
MARK D. FOX
UNITED STATES MAGISTRATE JUDGE

43

Copies of the foregoing report and recommendation have been sent to the following:

The Honorable Colleen McMahon, U.S.D.J.

David MacRae Wagner, Esq.
Freedman, Wagner, Tabakman & Weiss
130 North Main Street
Suite 202
New City, New York 10956

John E. Gura, Jr., Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York 10007